12 F.3d 388
 62 USLW 2423
 Michael A. LEBRON, Plaintiff-Counter-Defendant-Appellee,
v.
NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK), Defendant-Appellant,
Transportation Displays, Incorporated, Defendant-Counter-Claimant.
 No. 1494, Docket 93-7127.
 United States Court of Appeals,
Second Circuit.
 Argued April 27, 1993.
Decided Dec. 27, 1993.
 
 Kevin T. Baine, Washington, DC (Nicole K. Seligman, Steven M. Farina, Williams & Connolly, Washington, DC, William G. Ballaine, Mark S. Landman, Siff Rosen P.C., New York City, of counsel), for defendant-appellant.
 David D. Cole, Washington, DC (Center for Constitutional Rights, Washington, DC, R. Bruce Rich, Gloria C. Phares, Robin E. Silverman, Bernadette M. McCann Ezring, Jonathan Bloom, Weil, Gotshal & Manges, New York City, of counsel), for plaintiff-counter-defendant-appellee.
 Before: LUMBARD, NEWMAN,* and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Defendant-appellant National Railroad Passenger Corporation (Amtrak) ("Amtrak") appeals from a judgment entered February 11, 1993 in the United States District Court for the Southern District of New York, Pierre N. Leval, then-District Judge.** The judgment of the district court enjoined Amtrak and an advertising agency that performs services for Amtrak, defendant-counterclaimant Transportation Displays, Incorporated ("TDI"), to display a political advertisement prepared by plaintiff-counter-defendant-appellee Michael A. Lebron on a large billboard known as the Spectacular in New York City's Pennsylvania Station ("Penn Station"). Lebron had entered into a contract with TDI to lease the Spectacular for January and February 1993.
 
 
 2
 The district court ruled that because of the pervasive involvement of the federal government in Amtrak's structure and operations, Amtrak's conduct in controlling speech on its billboards must be deemed governmental, rather than private, in nature, and that Amtrak had violated the First Amendment by refusing to display Lebron's advertisement. Lebron v. National R.R. Passenger Corp. (Amtrak), 811 F.Supp. 993 (S.D.N.Y.1993).
 
 
 3
 We conclude that Amtrak is not a governmental actor subject to the strictures of the First Amendment, and accordingly reverse.
 
 Background
 
 4
 In August 1991, Lebron, an artist who creates billboard displays (frequently involving commentary on public issues), first contacted TDI, which manages the leasing of many of Amtrak's billboards, about contracting for billboard space in Penn Station. The Spectacular, a curved back-lit display space approximately 103 feet wide by ten feet high, dominates the west wall of the rotunda on the upper level of Penn Station where thousands of passengers pass each day. Lebron and TDI eventually agreed that Lebron would pay $16,500 per month to rent the Spectacular for January and February 1993. On November 30, 1992, Lebron and TDI signed an agreement (the "Lease") to that effect.
 
 
 5
 In negotiating the Lease, Lebron dealt primarily with William B. Schwartz, a TDI account executive, who informed Lebron that displays for the Spectacular containing obscenity or violence were unacceptable. Schwartz asked Lebron about the content of the advertisement that Lebron intended for the Spectacular, but Lebron declined to disclose it, explaining that while his work was generally political, he wanted to keep the specific nature of his advertisement for the Spectacular confidential prior to its display. Schwartz did not then suggest that there might be a problem with political advertisements on the Spectacular.
 
 
 6
 Although Amtrak authorized TDI to manage the leasing of Amtrak's billboard space, Amtrak at all times retained the right to approve or reject all advertising copy that would appear on its billboards. (In practice, Amtrak only reviewed displays that were to appear on the Spectacular.) Thus, the Lease contained the following language:
 
 
 7
 All advertising copy is subject to approval of TDI and [Amtrak] as to character, text, illustration, design and operation.
 
 
 8
 ....
 
 
 9
 If for any cause beyond its control TDI shall cease to have the right to continue the advertising covered by this contract, or if [Amtrak] should deem such advertising objectionable for any reason, TDI shall have the right to terminate the contract and discontinue the service without notice.
 
 
 10
 On December 2, 1992, Lebron submitted a color photocopy of the work he intended to display on the Spectacular to TDI, which TDI promptly forwarded to Amtrak. Lebron characterizes the advertisement as "an allegory about the destructive influence of a powerful, urban, materialistic and individualistic culture on rural, community based, family-oriented and religious cultures." The district court described it as follows:
 
 
 11
 The work is a photomontage, accompanied by considerable text. Taking off on a widely circulated Coors beer advertisement which proclaims Coors to be the "Right Beer," Lebron's piece is captioned "Is it the Right's Beer Now?" It includes photographic images of convivial drinkers of Coors beer, juxtaposed with a Nicaraguan village scene in which peasants are menaced by a can of Coors that hurtles towards them, leaving behind a tail of fire, as if it were a missile. The accompanying text, appearing on either end of the montage, criticizes the Coors family for its support of right-wing causes, particularly the contras in Nicaragua. Again taking off on Coors' advertising which uses the slogan of "Silver Bullet" for its beer cans, the text proclaims that Coors is "The Silver Bullet that aims The Far Right's political agenda at the heart of America."
 
 
 12
 811 F.Supp. at 995.
 
 
 13
 Anthony DeAngelo, Amtrak's vice president for real estate and operations development, viewed the photocopy and disapproved the display of Lebron's advertisement on the Spectacular. In a letter dated December 23, 1992, Amtrak notified TDI of its rejection, stating that "Amtrak's policy is that it will not allow political advertising on the [S]pectacualar advertising sign."Lebron then commenced this action against Amtrak and TDI, claiming violations of his First and Fifth Amendment rights as well as his contractual rights under the Lease. He sought equitable relief to compel Amtrak and TDI to display his ad on the Spectacular, or alternatively, damages for breach of the Lease. After expedited discovery and a trial on documentary submissions, the district court ruled that "in rejecting [Lebron's] contract to display his art on its billboard Amtrak was engaged in governmental action and ... the standards employed by Amtrak in rejecting his work violated its obligations under the First Amendment." 811 F.Supp. at 1005. In view of this conclusion, the district court did not reach Lebron's contractual claim. Id. at 1005 n. 5. Judgment was entered enjoining Amtrak and TDI to display Lebron's advertisement on the Spectacular "for two months beginning on the date that follows by six (6) business days the denial or expiration of any stay of [the district court's] judgment by the highest court having jurisdiction to issue such a stay."
 
 
 14
 Amtrak applied to the district court for a stay of its judgment pending appeal to this court. The district court denied the application, but "permit[ted] delay in compliance with the judgment" for fourteen days to allow an application for a stay to this court, while recommending against the grant of any such application.
 
 
 15
 This appeal followed. In response to a motion by Amtrak, this court stayed the execution of the district court's judgment pending appeal and expedited the appeal.
 
 Discussion
 
 16
 The First Amendment's directive "[t]hat 'Congress shall make no law ... abridging the freedom of speech, or of the press' is a restraint on government action, not that of private persons." Columbia Broadcasting Sys. v. Democratic Nat'l Comm., 412 U.S. 94, 114, 93 S.Ct. 2080, 2092, 36 L.Ed.2d 772 (1973) (plurality opinion) (citing Public Utilities Comm'n v. Pollak, 343 U.S. 451, 461, 72 S.Ct. 813, 820, 96 L.Ed. 1068 (1952)). Thus, in considering Lebron's claim that Amtrak violated his right to free speech, the threshold inquiry is whether Amtrak's refusal to run Lebron's advertisement on the Spectacular constitutes government action.
 
 
 17
 Government action is most readily found when the conduct at issue is performed by a government entity. However, that is not the case here. The Rail Passenger Service Act of 1970 (the "Act"), 45 U.S.C. Sec. 501 (1988) et seq., created Amtrak as a private, for-profit corporation under the District of Columbia Business Corporation Act. See 45 U.S.C. Sec. 541 (1988). This legislation rejected earlier suggestions that the nation's passenger rail service be nationalized. See Laurence E. Tobey, Costs, Benefits, and the Future of Amtrak, 15 Transp.L.J. 245, 252-53 (1987). Accordingly, the Act specifies that Amtrak is "not ... an agency, instrumentality, authority, or entity, or establishment of the United States Government." Sec. 541; see also National R.R. Passenger Corp. v. Atchison T. & S.F. Ry. Co., 470 U.S. 451, 454-55, 105 S.Ct. 1441, 1445-46, 84 L.Ed.2d 432 (1985).
 
 
 18
 The government action inquiry is more difficult when the challenged conduct is performed not by the government itself, but by a private entity. The Supreme Court has articulated a variety of approaches for discerning the presence of government action in the activities of private entities. See Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) (private conduct deemed government action when government coerces or significantly encourages that conduct); Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 158-59, 98 S.Ct. 1729, 1734-35, 56 L.Ed.2d 185 (1978) (private entity may be deemed government actor when performing role traditionally performed exclusively by government); Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974) (private action deemed governmental when "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself"); Burton v. Wilmington Parking Auth., 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961) (private action deemed governmental when the government "has so far insinuated itself into a position of interdependence with [a private entity] that it must be recognized as a joint participant in the challenged activity").[1]
 
 
 19
 As the Supreme Court has noted, "formulating an infallible test" of government action is an " 'impossible task.' " Reitman v. Mulkey, 387 U.S. 369, 378, 87 S.Ct. 1627, 1632, 18 L.Ed.2d 830 (1967) (quoting Burton, 365 U.S. at 722, 81 S.Ct. at 860). Rather, "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton, 365 U.S. at 722, 81 S.Ct. at 860.
 
 
 20
 In this case, the district court concluded that "based on examination of the federal government's deep and controlling entwinement in Amtrak's structure and operation, ... when Amtrak undertakes to control the content of speech on its billboards, its conduct must be deemed governmental rather than private." 811 F.Supp. at 997. Supporting this assessment, the district court described Amtrak as "a corporation whose directors are appointed by the President, whose operations are financed by the federal government, and whose properties, in major part, are mortgaged to the federal government." Id. at 998.
 
 
 21
 We need not reiterate the details underlying this description, see id. at 997-98 and nn. 3-8, because we do not take issue with this aspect of the district court's opinion, but rather with the legal conclusion that is derived from it. As the district court pointed out, there are "a number of cases in which discharged employees charged either Amtrak or the similarly structured Consolidated Rail Corporation ('Conrail') with unconstitutional governmental action ... [in which] the courts held that Amtrak's (or Conrail's) actions in dealing with its employees were not deemed to be governmental action." Id. at 999 (collecting cases).
 
 
 22
 One of these cases was Myron v. Consolidated Rail Corp., 752 F.2d 50 (2d Cir.1985). In that case, we held that:
 
 
 23
 [D]espite federal funding, regulation, stock ownership and representation on the board of directors, there is nothing resembling federal supervision of day-to-day activities. In sum, we conclude that despite an obviously close relationship, the federal government has not "so far insinuated itself into a position of interdependence" with Conrail that the latter's personnel decisions can be considered federal action.
 
 
 24
 Id. at 55-56 (footnote omitted) (quoting Burton, 365 U.S. at 725, 81 S.Ct. at 862).
 
 
 25
 The district court distinguished Myron and the similar precedents cited by the district court as follows:
 
 
 26
 The fact that Amtrak is considered a private employer in administering its employment of personnel does not mean it will be deemed private when it regulates speech. Whether conduct of a particular entity will be deemed governmental action can vary with the type of action at issue. As Judge Friendly explained in Wahba v. New York University, 492 F.2d 96, 100 [ (2d Cir.), cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1972) ], "we do not find decisions dealing with one form of state involvement and a particular provision of the Bill of Rights at all determinative in passing upon claims concerning different forms of governmental involvement and other constitutional guarantees." See also Weise v. Syracuse University, 522 F.2d 397, 404 (2d Cir.1975).
 
 
 27
 811 F.Supp. at 999 (footnote omitted).
 
 
 28
 We are not persuaded by this analysis. Myron addressed the "government action" issue in the specific context of a "claim that Conrail violated [Myron's] First and Fifth Amendment rights by discharging him for representing various people with interests adverse to Conrail." 752 F.2d at 54. We therefore decline to regard Myron as a precedent confined to employee matters that does not provide strong guidance, if not controlling authority, for our decision in this First Amendment case.
 
 
 29
 Wahba also involved an assertion of First Amendment claims, but we were nonetheless "unable to discern the government action necessary to sustain ... them." 492 F.2d at 98. Weise ruled that a less stringent standard for finding state action should be applied when racial or sexual discrimination is at issue, as is so often the case in employment litigation, than when there is a claim of a First Amendment violation. 522 F.2d at 405. Specifically, although we reversed and remanded the dismissal of plaintiffs' Sec. 1983 claims that they were denied employment or had their employment terminated because of sex discrimination, 522 F.2d at 400, 413, we explicitly stated that: "If our concern in this case were with discipline and the First Amendment, the alleged indicia of state action--funding and regulation--would most likely be insufficient." 522 F.2d at 405.
 
 
 30
 The district court expressed concern that in the absence of First Amendment restraints flowing from a finding of government action, Amtrak could post its own political advertisements on the Spectacular, postulating the example that Amtrak "would be free under the First Amendment to donate its billboards to the support of the incumbent President's election." 811 F.Supp. at 1000. Whatever its constitutional implications, which we do not address, such conduct would constitute a criminal violation of federal law. See 2 U.S.C. Secs. 441b, 437g(d) (1988); see also Stern v. Federal Election Comm'n, 921 F.2d 296, 297 (D.C.Cir.1990) (noting Sec. 441b prohibition of corporate political contributions).
 
 
 31
 Our opinion in Myron accords with numerous cases that have concluded that Amtrak and Conrail are not subject to constitutional restraints upon government action. See, e.g., Andrews v. Consolidated Rail Corp., 831 F.2d 678, 682-83 (7th Cir.1987) (following Myron ); G. & T. Terminal Packaging Co. v. Consolidated Rail Corp., 830 F.2d 1230, 1236 (3d Cir.1987) ("Every court that has considered the matter has concluded that Conrail is not a governmental actor for purposes of constitutional analysis."), cert. denied, 485 U.S. 988, 108 S.Ct. 1291, 99 L.Ed.2d 501 (1988); Morin v. Consolidated Rail Corp., 810 F.2d 720, 722-23 (7th Cir.1987) (per curiam) (following Myron ); Anderson v. National R.R. Passenger Corp. (Amtrak), 754 F.2d 202, 204-05 (7th Cir.1984) (per curiam); Verdon v. Consolidated Rail Corp., 828 F.Supp. 1129, 1137 (S.D.N.Y.1993); Wilson v. Amtrak Nat'l R.R. Corp., 824 F.Supp. 55, 57-58 (D.Md.1992); Railway Labor Executives' Ass'n v. National R.R. Passenger Corp., 691 F.Supp. 1516, 1524 n. 11 (D.D.C.1988); Marcucci v. National R.R. Passenger Corp., 589 F.Supp. 725, 727-29 (N.D.Ill.1984); Kimbrough v. National R.R. Passenger Corp., 549 F.Supp. 169, 172-73 (M.D.Ala.1982).
 
 
 32
 In view of this unvarying line of authority, and the fact that our pertinent precedent addressed an issue of First Amendment retaliation, see Myron, 752 F.2d at 54, we conclude that Amtrak's refusal to run Lebron's advertisement on the Spectacular was not government action, and accordingly is not to be tested against the requirements of the First Amendment. Thus, we do not reach the merits of Lebron's First Amendment claim.
 
 
 33
 In view of the dismissal of Lebron's only federal claim, it will not be appropriate for the district court to address his contract claim on remand.[2] See United Mine Workers v. Gibbs, 383 U.S. 715, 726-27, 86 S.Ct. 1130, 1139-40, 16 L.Ed.2d 218 (1966); Eatz v. DME Unit of Local Union No. 3, 973 F.2d 64, 67 (2d Cir.1992). Lebron is free to pursue that claim in state court. Under N.Y.Civ.Prac.L. & R. 213 (McKinney 1990), Lebron's contract claim is subject to a six year statute of limitations. See also id. 205(a) (McKinney Supp.1993), id. cmt. 205:2 (McKinney 1990) (in any event, Lebron may sue in state court within six months of dismissal in federal court).
 
 Conclusion
 
 34
 The judgment of the district court is reversed and the case is remanded with the instruction to dismiss the complaint. As stated at oral argument, Lebron's motion to strike pages from the joint appendix and for double costs and attorney fees is denied; his motion to file a supplemental volume of exhibits is granted.
 
 JON O. NEWMAN, Chief Judge, dissenting:
 
 35
 The issue presented by this appeal is whether Amtrak, formally known as the National Railroad Passenger Corporation, is subject to the First Amendment when it acts to deny advertising space on the basis of political content. Because I believe the First Amendment limits Amtrak in making such decisions, I respectfully dissent.
 
 
 36
 The Court does not dispute the detailed findings of the District Court as to the extent of the Government's role in the structure and financing of Amtrak, including the undeniable fact that six members of the nine-member Amtrak board are appointed by the President of the United States, two others by the Government as owner of Amtrak's preferred stock, and the ninth member by the other board members. Instead, the Court relies on prior cases that have ruled Amtrak and Conrail not to be governmental actors when they discharge or fail to rehire workers, see, e.g., Andrews v. Consolidated Rail Corp., 831 F.2d 678, 682-83 (7th Cir.1987); Anderson v. National R.R. Passenger Corp. (Amtrak), 754 F.2d 202, 204-05 (7th Cir.1984), even where First Amendment rights are peripherally involved, see, e.g., Myron v. Consolidated Rail Corp., 752 F.2d 50, 54-56 (2d Cir.1985).
 
 
 37
 However, it has long been the law in this Circuit, and the Supreme Court has given no contrary indication, that the state action determination is dependent in part on the nature of the constitutional right alleged to have been impaired. See Weise v. Syracuse University, 522 F.2d 397, 404 (2d Cir.1975); Wahba v. New York University, 492 F.2d 96, 100 (2d Cir.), cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974). In the District Court, Amtrak conceded that, if it restricted service to passengers on the basis of race, religion, or national origin, it would be deemed a governmental actor in that respect. See Lebron v. National R.R. Passenger Corp. (Amtrak), 811 F.Supp. 993, 999 (S.D.N.Y.1993).
 
 
 38
 In view of the extensive involvement of the Government in the structure and financing of Amtrak, I agree with then-District Judge Leval that Amtrak is a governmental actor, subject to First Amendment limitations, when it undertakes to regulate the political content of advertisements on its billboards. Our ruling in Myron is not a precedent for forgoing all First Amendment scrutiny with respect to Amtrak. We there ruled that Conrail was not subject to First Amendment limitations for discharging an employee for disloyalty. Though the employee, an attorney, had sought to reenforce his employment claim with an allegation that his First Amendment right to represent fellow employees in litigation was being impaired by his discharge, we made it clear that what we were placing beyond constitutional scrutiny were Conrail's "personnel decisions." Myron, 752 F.2d at 55-56. At most an indirect First Amendment issue was implicated. By contrast, in the pending case Amtrak purports to have complete insulation from a core First Amendment claim--that it determines the use of its resources, in this case, the availability of its advertising spaces, on the basis of political views.
 
 
 39
 In permitting this frontal First Amendment challenge to be governed by the oblique First Amendment ruling in Myron, the Court dismisses rather brusquely the District Court's forcefully articulated concerns as to the consequences of First Amendment exemption for Amtrak in its advertising decisions. Judge Leval pointed out that, without First Amendment limitation, Amtrak would be free to sponsor advertisements on its billboards taking sides with respect to political contests, or promoting or denigrating particular religions, or advocating its view on contentious public issues like abortion. See Lebron, 11 F.Supp. at 1000. The Court makes no response with respect to the prospect of Amtrak's using its advertising resources on matters of religion or public issues, and rejects the concern about politics by pointing out that "donation" of advertising space would run afoul of existing statutes. No mention is made of the District Court's valid concern about Amtrak's opportunity to sell advertising space only to candidates it favors.
 
 
 40
 In any event, the existence of a limited statutory bar to one aspect of the serious concerns raised by the District Court is no answer to Lebron's constitutional claim. The fact that a corporation like Amtrak, organized by authority of an act of Congress, would be criminally liable if its donation of advertising space were deemed to be a political contribution, see 2 U.S.C. Secs. 441b, 437g(d) (1988), provides no remedy for a civil plaintiff like Lebron who claims a First Amendment violation because his offer to purchase advertising space has been rejected, allegedly without required limitations on Amtrak's discretion, because of the ad's political content.
 
 
 41
 Though I disagree with the majority's ruling requiring the outright dismissal of Lebron's suit, I would not uphold the District Court's injunction requiring Amtrak to display Lebron's ad. Amtrak's advertising policy may well run afoul of First Amendment limitations, as the District Court ruled, notably because the current "vague policy provides Amtrak officials with precisely the kind of unfettered discretion to control speech that the Supreme Court has held to contravene the First Amendment," Lebron, 811 F.Supp. at 1003. But the policy, despite its vagueness, is claimed to prohibit political messages. This is not a case where an official, subject to First Amendment restraint, has used unfettered discretion to deny permission to use a traditional public forum like city streets for a parade. See Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Amtrak's billboard space in Pennsylvania Station, even if used in the past for ads of a public service nature, has not become a forum for ads of such pointed political content as Lebron's attack on the makers of Coors beer for promoting "The Far Right's political agenda." Lebron, 811 F.Supp. at 995. On the present record, it is not an appropriate use of a federal court's equity power to force Amtrak to venture so extensively into the political arena. If the denial of advertising space under Amtrak's existing policies encounters First Amendment objections, damage remedies and declaratory relief will have to suffice.
 
 
 42
 For these reasons, I dissent from the judgment ordering the complaint dismissed.
 
 
 
 *
 Judge Newman became chief judge of the Second Circuit Court of Appeals on July 1, 1993
 
 
 **
 Judge Leval became a member of the Second Circuit Court of Appeals on November 8, 1993
 
 
 [1]
 Some commentators have suggested that more recent Supreme Court cases, and especially the Court's ruling that the United States Olympic Committee is not a governmental actor subject to constitutional restraints in San Francisco Arts & Athletics, Inc. v. United States Olympic Committee, 483 U.S. 522, 542-47, 107 S.Ct. 2971, 2984-87, 97 L.Ed.2d 427 (1987), have curtailed Burton 's precedential authority. See Laurence H. Tribe, American Constitutional Law Sec. 18-3, at 1701 n. 13 (2d ed. 1988); Marcia Berman, An Equal Protection Analysis of Public and Private All-Male Military Schools, 1991 U.Chi.Legal F. 211, 225-26; see also Jackson, 419 U.S. at 358, 95 S.Ct. at 457 ("actual holding" of Burton limited to lessees of public property); Adams v. Vandemark, 855 F.2d 312, 317 n. 7 (6th Cir.1988) ("The more recent Supreme Court cases in this area appear to have limited the broad realm of state action Burton suggested."), cert. denied, 488 U.S. 1042, 109 S.Ct. 868, 102 L.Ed.2d 992 (1989); Imperiale v. Hahnemann Univ., 776 F.Supp. 189, 195-96 (E.D.Pa.1991) (same), aff'd, 966 F.2d 125 (3d Cir.1992) (per curiam)
 
 
 [2]
 Correspondingly, TDI's counterclaim for a declaratory judgment that it is entitled to terminate the Lease will not be decided in this action